## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **MALLIE LEE HILL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09cv00069 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

Plaintiff, Mallie Lee Hill, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.*  (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hill protectively filed her applications for DIB and SSI on August 28, 2007, alleging disability as of February 1, 2005, due to "nerves," diabetes, burning all over her body due to possible nerve damage, female infections, high blood pressure and hip problems. (Record, ("R."), at 122-24, 130-39, 159, 164.) The claims were denied initially and on reconsideration. (R. at 72-74, 79-81, 83-85, 87-91, 93-94, 96-97.) Hill then requested a hearing before an administrative law judge, ("ALJ"). (R. at 98.) The hearing was held on March 19, 2009, at which Hill was represented by counsel. (R. at 39-67.)

By decision dated April 29, 2009, the ALJ denied Hill's claims. (R. at 21-38.) The ALJ found that Hill met the nondisability insured status requirements of the Act for DIB purposes through at least the date of the decision. (R. at 36.) The ALJ also found that Hill had not engaged in substantial gainful activity since February 1, 2005, the alleged onset date. (R. at 36.) The ALJ determined that the medical evidence established that Hill suffered from the following impairments which, in combination, constituted a "severe" physical impairment: type II diabetes mellitus, abdominal and pelvic pain, obesity, reflux disease, hypertension, history of gallbladder surgery, history of bronchitis, status-post 2008 hysterectomy, history of recurring urinary tract infections and allergies. (R. at 26, 36.) The ALJ found that, beginning in January 2009, Hill had medically determinable mental impairments of affective disorder,

anxiety related disorder, personality disorder, organic mental disorder and mental retardation, which were severe at times, but did not meet the 12-month durational requirement of the Act. (R. at 27, 31.) However, the ALJ found that, prior to 2009 the only mental health-related complaints and treatment received by Hill were for anxiety and depression and were not severe. (R. at 27, 30.) The ALJ concluded that Hill did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26, 36.) The ALJ found that Hill had the residual functional capacity to perform medium work[1] with limitations on her ability to climb ladders, ropes and scaffolds due to obesity. (R. at 37.) Therefore, the ALJ found that Hill was able to perform her past relevant work as a deli worker, a cook and a cashier. (R. at 35, 37.) Alternatively, based on Hill's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Hill could perform, including jobs as a food prep worker, a dishwasher and a packer. (R. at 36.) Thus, the ALJ found that Hill was not under a disability as defined under the Act and was not eligible for benefits. (R. at 37.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2010).

After the ALJ issued her decision, Hill pursued her administrative appeals, (R. at 16-17), but the Appeals Council denied her request for review. (R. at 1-4.) Hill then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2010).

---

[1]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2010).

The case is before this court on Hill's motion for summary judgment filed April 14, 2010, and the Commissioner's motion for summary judgment filed May 14, 2010.

## II. Facts

Hill was born in 1968, (R. at 43, 122), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She completed the ninth grade[2] and has past work experience as a cleaner in a furniture factory, a seamstress in a sewing factory, a cook, a dishwasher, a fast food worker, a deli worker and a cashier. (R. at 43-47, 185.) Hill testified that she was placed in all special education classes beginning in the third grade.[3] (R. at 54, 173.)

Hill testified that she last worked at McDonald's as a cook, but quit working in 2005 because of her "nerves and stuff and [her] health got too bad and [she] just couldn't take it [any]more." (R. at 44.) She testified that she did not seek medical help for her nerves at that time due to lack of insurance. (R. at 44.) She stated that her nerves continued to worsen after she quit working. (R. at 60.) She testified that, in addition to her nerves, she had a burning sensation in her lower abdomen and lower

---

[2]Because Hill completed only the ninth grade, she has a "limited education," defined in the regulations as having an ability in reasoning, arithmetic and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semiskilled or skilled jobs. An individual with a seventh-grade through eleventh-grade level of formal education is deemed to have a limited education. *See* 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2010).

[3]Hill's school records show that she attended "AD Academics" during the 1983-84 school year and for three periods during the 1984-1985 school year with the same teacher. (R. at 230.) The records also show that Hill was retained in the second grade and, although she failed all but one class during her seventh-grade year, she was promoted to the eighth grade. (R. at 233.)

back.  (R. at 45, 49.)

Hill testified that she stayed anxious and depressed all the time, suffering from panic attacks, crying spells, memory difficulties and a dislike of being around others. (R. at 47.)  She stated that her difficulty with her nerves began during childhood, but had worsened over the years. (R. at 60.)  She stated that she began taking medications for these mental health problems in 2006 or 2007, and although she had not been hospitalized for these problems, she had received emergency room treatment on numerous occasions for symptoms of anxiety and depression.  (R. at 47-49.)  She also stated that she had seen a counselor more than once.  (R. at 50.)  She testified that she attended all special education classes beginning in the third grade and had difficulty learning, causing her to eventually drop out of school.  (R. at 54.)  Hill testified that her mental conditions prevented her from working because she could not handle being around a lot of people, sometimes becoming nauseated and throwing up.  (R. at 50-51.)  She noted that she physically trembled approximately two-thirds of the time, which she attributed to her nerves.  (R. at 55.)  Hill testified that she was taking Xanax, Klonopin and Cymbalta, which helped some, but not completely.  (R. at 53, 60.)

In addition to her alleged mental impairments, Hill testified that she was diagnosed with diabetes in 2006, which was controlled with medication.  (R. at 48.)  She stated that she was diagnosed with endometriosis in 1990, which had resulted in her having to undergo seven D&C procedures.  (R. at 57.)  She also underwent two uterine ablations in December 2005 and January 2006, respectively.  (R. at 236-40.)  Hill eventually underwent a complete hysterectomy in March 2008.  (R. at 58, 498,

502.)  Despite all of these procedures, she testified that she continued to suffer from burning in her stomach and back.  (R. at 59.)  Hill testified that being on her feet caused her stomach to swell and burn, noting that she could stand for only "a few minutes at a time" and sit for only "so long" before having to lie down.  (R. at 51.)  She also stated that her nerves made her stomach burn worse.  (R. at 51.)  Hill testified that she had difficulty bending and could perform little housework.  (R. at 51-52.)  She stated that she sometimes had difficulty using her hands due to bilateral numbness and tendonitis, for which she had received no treatment.  (R. at 52.)

John Newman, a vocational expert, also was present and testified at Hill's hearing. (R. at 61-66.) Newman classified Hill's work as a cook, a cashier/deli worker, a dryer operator, a cashier, a furniture wiper and a housekeeper as light[4] and unskilled and as a sewing machine operator as light and semiskilled. (R. at 63.)  Newman testified that a hypothetical individual of Hill's age, education and past work experience, who could perform medium work that did not require working around hazardous machinery or around unprotected heights, could perform Hill's past relevant work.  (R. at 63.)  He further testified that the same individual, but who was limited to simple, routine, repetitive unskilled work that involved only occasional interactions with the general public, could perform Hill's past work as a furniture wiper and as a dryer operator.  (R. at 63-64.)  Newman also testified that such an individual could perform the additional light jobs of a food preparation worker, a dishwasher and a packer.  (R. at 64.)  Newman testified that the same hypothetical

---

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010).

individual, but who could sit or stand for only a few minutes at a time and who had to lie down if she stood or sat too long, rendering her unable to stay on task 30 to 40 percent of the workday, could not perform any of Hill's past relevant work or any other jobs existing in significant numbers in the national economy. (R. at 65.)

In rendering her decision, the ALJ reviewed records from Virginia Public Schools; Ft. Chiswell High School; Wythe County Schools; Dr. Wayne Pennell, M.D.; Dr. Feliciano J. Jusay, M.D.; Carilion New River Valley Medical Center; Dr. Anand T. Kishore, M.D.; Dr. James S. Weston, M.D.; Carilion Surgical Care Christiansburg; Ft. Chiswell Family Practice; Pulaski Community Hospital; Wythe County Community Hospital; Dr. Kyoung S. Cho, M.D.; Dr. Elizabeth Fox, M.D.; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Wythe Medical Associates, Inc.; Dr. Amanda Brewer-Smith, M.D.; Infinity Counseling Center; Carilion New River Valley Wound Center; Jeanne Watson, Ph.D., a licensed professional counselor; and Dr. Medhat N. Elmasry, M.D., Ph.D.

Hill presented to the emergency department at Wythe County Community Hospital on 11 separate occasions from February 17, 2004, through August 27, 2007. (R. at 347-423.) Over this time period, Hill was treated for acute pharyngitis, acute bronchitis, costochondritis, acute urinary tract infections, urinary incontinence, a right ankle sprain and an abscessed tooth. (R. at 347-423.) X-rays of the right ribs performed on February 17, 2004, were negative for fracture. (R. at 360.) Dr. Wayne E. Pennell, M.D., performed an endometrial ablation on December 14, 2005, and

again on January 24, 2006. (R. at 236-40.) On January 21, 2006, Hill complained of pain and burning, and Dr. Feliciano Jusay, M.D., a gynecologist, ordered a pelvic ultrasound, which was normal. (R. at 251, 258, 382.) On January 24, 2006, Hill had the same complaints, and Dr. Jusay prescribed Anaprox. (R. at 250.) Chest x-rays and abdominal x-rays performed on February 6, 2006, also were normal. (R. at 257, 393.) On February 8, 2006, Hill complained of pain and swelling in the lower abdomen, as well as urinary incontinence with straining. (R. at 249.) Dr. Jusay diagnosed abdominal pain and urinary incontinence. (R. at 249.) On February 21, 2006, she rated her abdominal pain as a seven on a 10-point scale, and she noted continued urinary incontinence. (R. at 248.) Testing performed on February 23, 2006, revealed possible urinary retention with possible overflow incontinence. (R. at 248.) On April 8, 2006, and again on April 22, 2006, Hill complained of burning, pain and swelling of the lower abdomen. (R. at 245-46.) Dr. Jusay diagnosed persistent abdominal pain and obesity and encouraged Hill to diet. (R. at 245.)

On May 20, 2006, Hill presented to the emergency department at Carilion New River Valley Medical Center, ("New River Valley"), with complaints of abdominal pain, nausea and vomiting, which she had experienced for approximately two years, but which had worsened over the previous two months. (R. at 260.) Testing was consistent with reflux esophagitis. (R. at 260.)

Hill presented to the emergency department at Pulaski Community Hospital on June 7, 2006, with complaints of epigastric burning. (R. at 332.) She was diagnosed with GERD and was prescribed Nexium. (R. at 333.) On July 6, 2006, she continued to complain of abdominal bloating and burning in the lower abdomen, low back and

genital area. (R. at 307.) Dr. James S. Weston, M.D., recommended a colonoscopy and possible laparoscopic exploration. (R. at 307.) On September 11, 2006, an abdominal and pelvic CT scan showed two gallstones, but no evidence of acute cholecystitis. (R. at 335.) X-rays dated September 14, 2006, showed no active chest disease and a normal abdomen. (R. at 337.) On September 18, 2006, Hill underwent an esophagogastroduodenoscopy, ("EGD"), with biopsy for H. pylori and a colonoscopy for evaluation of heartburn and abdominal pain by Dr. Anand Kishore, M.D. (R. at 290, 303-04.) The results of the EGD were normal with the exception of some erythema in the antrum, and the colonoscopy revealed only internal hemorrhoids. (R. at 290, 303, 305-06.) An upper GI with small bowel series, performed on September 20, 2006, showed findings consistent with reflux esophagitis and normal small bowel. (R. at 301.) On September 22, 2006, Hill again presented to New River Valley with complaints of abdominal and chest burning, with some burning between the shoulder blades, for the previous three days, nausea, diarrhea, episodes of chilling and poor appetite. (R. at 262, 264.) She exhibited moderate diffuse abdominal tenderness, no back tenderness and a normal heart rate and rhythm and was diagnosed with abdominal pain and cholelithiasis, not otherwise specified. (R. at 263-64, 267.) She was prescribed Phenergan and Lortab, and gallbladder surgery was recommended. (R. at 267.)

Hill saw Dr. Charles D. Bissell, M.D., on September 27, 2006, for an evaluation of her gallstones. (R. at 315-16.) Hill had tenderness of the upper right quadrant. (R. at 315-16.) Dr. Bissell diagnosed symptomatic cholelithiasis, and Hill opted to have gallbladder surgery, which Dr. Bissell performed on September 28, 2006. (R. at 285-86, 316.) On October 5, 2006, Hill complained of bilateral lower quadrant abdominal

burning, back pain and pyrosis. (R. at 314.) She stated that these symptoms preexisted her surgery, but that her right upper quadrant pain and nausea were alleviated with the surgery. (R. at 314.) Dr. Bissell diagnosed bilateral lower quadrant abdominal pain. (R. at 314.) Later that same day, Hill presented to New River Valley with complaints of sharp lumbar pain and abdominal burning for the previous week, as well as nausea and poor appetite. (R. at 272.) Physical examination revealed a normal abdomen, but paralumbar pain with palpation. (R. at 274.) She had normal heart rate and rhythm and intact motor skills and sensation. (R. at 274.) An echocardiogram showed sinus tachycardia, but was otherwise normal. (R. at 279.) Chest x-rays showed no evidence of active cardiac or pulmonary disease. (R. at 283.) A CT scan of the abdomen and pelvis performed on October 11, 2006, was unremarkable. (R. at 284.)

When Hill saw Dr. Bissell on October 12, 2006, she reported that her pain syndrome was improving, noting that the lower abdominal burning had become intermittent. (R. at 312.) She exhibited decreased abdominal tenderness to palpation of the bilateral lower quadrants. (R. at 312.) Dr. Bissell diagnosed bilateral lower quadrant pain with leukocystosis. (R. at 312.)

When Hill presented to Fort Chiswell Family Practice as a new patient on October 20, 2006, she was diagnosed with acute bronchitis, GERD and lower abdominal pain. (R. at 326.) On October 27, 2006, she was again diagnosed with acute bronchitis. (R. at 330-31.) On November 16, 2006, Hill was diagnosed with sinusitis. (R. at 325.) On December 18, 2006, she was diagnosed with a urinary tract infection, acute bronchitis and uncontrolled diabetes mellitus, and she was prescribed

medications.  (R. at 324.)  On March 20, 2007, Hill complained of frequency, urgency and burning with urination and was again diagnosed with a urinary tract infection.  (R. at 328-29.)  Chest x-rays were normal on that day.  (R. at 334.)  From May 5, 2007, through June 30, 2007, Dr. Cho diagnosed diabetes mellitus, a yeast infection and GERD, and he prescribed medications.  (R. at 427-30.)

On April 14, 2007, Hill saw Dr. Kyoung S. Cho, M.D., with complaints of a possible ongoing urinary tract infection.  (R. at 432.)  Dr. Cho diagnosed dysuria, urinary tract infection and possible diabetes mellitus, and she was prescribed Pyridium.  (R. at 432.)  On April 28, 2007, Hill was diagnosed with a urinary tract infection, a yeast infection and diabetes mellitus.  (R. at 431.)

When Hill returned to Wythe County Community Hospital on July 30, 2007, with complaints of twisting her right ankle, x-rays were negative for fracture.  (R. at 414, 416.)  In August 2007, Hill wore a 24-hour Holter monitor after complaining of palpitations, the results of which were mildly abnormal for Hill's age, but showed an underlying normal sinus rhythm and no ventricular ectopy.  (R. at 418-20, 423.)  On August 20, 2007, Dr. Cho diagnosed diabetes mellitus, genital itching and GERD.  (R. at 426.)  On August 25, 2007, Hill was diagnosed with hypertension, diabetes mellitus and urinary tract infection and was continued on medications.  (R. at 425.)  On September 8, 2007, Hill had the same complaints and diagnoses.  (R. at 424.)

Hill saw Dr. Elizabeth Fox, M.D., on October 10, 2007, for an annual gynecological examination.  (R. at 450-51.)  She complained of pelvic pain, diarrhea, reflux, leakage of urine with sneezing and coughing, numbness, memory loss, mood

swings and depression.  (R. at 451.)  Dr. Fox noted uterine tenderness and diagnosed Hill with pelvic pain.  (R. at 450.)  Pap smear results were normal.  (R. at 629.)  On November 2, 2007, Dr. Cho diagnosed another urinary tract infection.  (R. at 475.)  A pelvic ultrasound on November 5, 2007, showed no adnexal mass or free fluid and a probable tiny posterior uterine fundal fibroid.  (R. at 651.)  Hill opted to proceed with diagnostic laparoscopy and possible operative laparoscopy.  (R. at 628.)  She noted some mood swings and some depression, but she denied anxiety.  (R. at 628.)  On November 30, 2007, Hill presented to the emergency department at Wythe County Community Hospital with complaints of burning across the lower abdomen and back for the previous two to three days, as well as burning with urination.  (R. at 490-94.)  A pelvic examination was performed, but Hill left the emergency department against medical advice.  (R. at 492-94.)  She was diagnosed with acute abdominal pain of uncertain etiology.  (R. at 494.)  Hill again presented to the emergency department at Wythe County Community Hospital on December 18, 2007, with complaints of burning in the chest and stomach, elevated blood pressure and vomiting.  (R. at 482-84, 642-45.)  Her blood pressure was 153/102.  (R. at 643.)  Hill was diagnosed with gastroenteritis and was prescribed Phenergan.  (R. at 643.)

Joseph I. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on December 20, 2007, finding that Hill had no medically determinable impairment, noting that Hill had undergone no psychiatric hospitalizations or outpatient psychiatric treatment.  (R. at 453-65.)  He further noted that treatment notes showed that Hill was consistently alert and oriented with a normal mood and affect and that she had not been prescribed any medications for anxiety or depression.  (R. at 465.)  Finally, Leizer noted that Hill was able to manage money and

bills, shop, prepare meals, wash dishes, perform light housekeeping, attend church, read, sew, watch television and perform personal care. (R. at 465.) Leizer concluded that Hill's disability allegations were incredible, as there was no evidence of a medically determinable psychiatric impairment. (R. at 465.)

The following day, Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Hill could perform medium work. (R. at 466-71.) Dr. Surrusco imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 468-69.) He found Hill's allegations to be partially credible. (R. at 471.)

On January 14, 2008, Dr. Cho again diagnosed a urinary tract infection and prescribed Cipro. (R. at 474.) On February 7, 2008, Hill complained of occasional heart fluttering, occasional shortness of breath with extreme exertion, occasional diarrhea, gastroesophageal reflux, leakage of urine with coughing and sneezing and some mild peripheral numbness. (R. at 628.) On February 9, 2008, Hill was cleared for laparoscopic surgery by Dr. Cho, which was performed on February 11, 2008. (R. at 473, 506-07, 631-32.) Specifically, Dr. Fox performed a diagnostic and operative laparoscopy with lysis of adhesions and peritoneal biopsy. (R. at 506.) Hill was diagnosed with pelvic pain, back pain, dyspareunia[5] and abdominal and pelvic adhesions and probable endometriosis. (R. at 506, 631.) On February 16, 2008, Hill complained of nerves and anxiety, for which Dr. Cho diagnosed anxiety and prescribed Xanax. (R. at 472.)

---

[5]Dyspareunia refers to painful sexual intercourse. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 519 (27th ed. 1988).

On March 10, 2008, Hill underwent a total hysterectomy by Dr. Fox. (R. at 498, 502.) She was diagnosed with endometriosis, pelvic pain, back pain and dyspareunia, and her post-operative course was unremarkable. (R. at 495, 498.) Upon discharge two days later, Hill was instructed to increase activity as tolerated, and she was restricted from lifting items weighing more than 10 pounds for three weeks. (R. at 496.) On March 20, 2008, Hill was diagnosed with an abdominal wound infection and was treated with medications in the emergency department at Wythe County Community Hospital. (R. at 604-05.)

From May 8, 2008, through July 25, 2008, Hill was seen at Wythe Medical Associates, Inc., for lesions on the lower abdomen, allergies, stiffness and swelling of the fingers of the left hand and possible urinary tract infection. (R. at 652-60.) She was diagnosed with sinusitis, diabetes mellitus, allergies, cellulitis, hypertension, anxiety and dysuria. (R. at 652-60.) Hill was prescribed Xanax, Keflex, Metformin, Allegra, Doxycycline and Pyridium. (R. at 652-60.)

Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF on May 12, 2008, finding that Hill suffered from a nonsevere affective disorder and a nonsevere anxiety related disorder. (R. at 509-22.) He further found that Hill had no restrictions on her activities of daily living, had no difficulties maintaining social functioning or maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 519.) Perrott noted that Hill had not undergone any psychiatric hospitalizations or outpatient psychiatric treatment and that she had been prescribed no medication for anxiety or depression. (R. at 521.) On reconsideration, Perrott noted that Hill had been prescribed Xanax for

anxiety and depression on February 16, 2008. (R. at 521.) He found her allegations partially credible and concluded that the medical evidence did not establish the presence of a severe and disabling mental impairment. (R. at 521.)

The same day, Dr. Joseph Duckwall, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding that Hill could perform medium work. (R. at 523-28.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 525-26.) Dr. Duckwall found Hill's allegations partially credible. (R. at 528.)

Hill began seeing Christopher Carusi, Ph.D., at Infinity Counseling Center, on May 15, 2008. (R. at 675.) Hill reported being on edge all the time, crying for no reason and self-isolation. (R. at 675.) She stated that she had experienced these symptoms for the previous four years. (R. at 675.) Hill stated that she had quit her job due to these symptoms and could not take criticism. (R. at 675.) Carusi diagnosed generalized anxiety disorder and panic without agoraphobia. (R. at 675.) Hill continued to see Carusi for counseling through October 8, 2008. (R. at 664-74, 683-84.) Over this time, Carusi focused on helping Hill develop basic cognitive-behavioral strategies to more effectively manage her anxiety. (R. at 664-74, 683-84.) On June 25, 2008, Hill reported having had a few better days that week. (R. at 672.) On July 10, 2008, Hill reported feeling more jittery due to a decrease in her Xanax dosage. (R. at 671.) Carusi noted that Hill was noticing more results from her coping strategies. (R. at 671.) On July 23, 2008, Hill rated her depression, sleep disturbance, somatic complaints, impaired concentration and impaired memory as moderate, her impulsiveness, sexual issues, appetite disturbance, hyperactivity and panic attacks as

mild, and her anxiety and irritability as severe.  (R. at 669.)  Hill reported frequent anxiety with occasional panic attacks and feeling uncomfortable around others.  (R. at 669.) Carusi noted treatment goals of being more comfortable around people, being able to function without pushing herself and being more content in her life.  (R. at 670.)  He anticipated weekly sessions for three months.  (R. at 670.)

Hill was seen at the Carilion New River Valley MC Wound Care Center from July 16, 2008, through August 20, 2008, for nonhealing lesions on her lower abdomen beginning in April 2008.  (R. at 676-82.)  A discharge summary dated August 20, 2008, noted that Hill's wounds were closed as of August 8, 2008, and Hill's pain had decreased to a two on a ten-point scale from a nine to 10 on a 10-point scale.  (R. at 676.)  Hill was instructed to use skin repair cream.  (R. at 676.)

Hill presented to the emergency department at Wythe County Community Hospital with complaints of sores on her stomach and a fever on July 25, 2008.  (R. at 594-97.)  She was diagnosed with a skin infection and a urinary tract infection.  (R. at 595.)  She was given Doxycycline and was advised to follow-up with a wound center.  (R. at 597.)

On July 30, 2008, Carusi noted that Hill needed to be more consistent in practicing anxiety management techniques.  (R. at 667.)  On August 18, 2008, Hill reported practicing her cognitive strategies daily with varying success.  (R. at 666.)  On August 27, 2008, Hill reported recently having some good days and some bad days.  (R. at 665.)  On October 1, 2008, Hill reported increased stress due to family illness and that she had experienced a panic attack the previous day.  (R. at 684.)

From May 15, 2008, through October 8, 2008, Hill missed six counseling sessions. (R. at 664.)

Hill saw Dr. Amanda Brewer-Smith, O.D., an opthalmologist on August 25, 2008. (R. at 663.) Hill's corrected vision was 20/20 in both eyes. (R. at 663.) She was diagnosed with allergic conjunctivitis and was prescribed Pataday. (R. at 663.) Dr. Brewer-Smith noted no diabetic neuropathy. (R. at 663.)

Hill returned to Wythe Medical Associates on August 29, 2008, and was diagnosed with a urinary tract infection, for which she was prescribed Cipro. (R. at 687.) She was seen at Ft. Chiswell Medical Center on November 24, 2008, with complaints of a burning sensation in the stomach, abdominal lesions and a racing heart, and Wellbutrin was initiated. (R. at 688.)

Hill saw Dr. Medhat N. Elmasry, M.D., from January 9, 2009, through March 11, 2009. (R. at 698-714.) On January 9, 2009, Hill complained of a sore throat, gastritis, GERD and depression. (R. at 710.) She noted that her hypertension was improved, and her diabetes was controlled. (R. at 710.) Hill had a flat affect. (R. at 710.) She was diagnosed with generalized abdominal pain, sinusitis, stable diabetes, a mood disorder, not otherwise specified, otitis media with effusion, generalized anxiety disorder and major depression, not otherwise specified. (R. at 702.) Hill declined a psychiatric consult and counseling. (R. at 702.) On January 30, 2009, she noted that her depression was not improving and that her mood swung between depression and anxiety. (R. at 706.) She noted sadness with occasional crying with no significant improvement of symptoms since beginning Cymbalta. (R. at 706.) Dr.

Elmasry noted that Hill had a flat affect. (R. at 706.) Dr. Elmasry diagnosed acute gastritis, stable diabetes mellitus type II, major depression, not otherwise specified, cystitis and GERD. (R. at 706-07.) He continued Cymbalta and Xanax and initiated Klonopin. (R. at 707.) Hill declined a psychiatric consult and psychiatric counseling. (R. at 707.) On February 13, 2009, Hill continued to complain of abdominal pain, as well as bilateral ear pain, facial pain and nasal discharge, but she noted lessened stress, lessened racing thoughts, better sleep, fewer crying spells, no grandiose ideas, better attention span and improvement in mood swings with medication. (R. at 698.) She denied suicidal thoughts. (R. at 698.) Hill had a flat and anxious affect. (R. at 698.) Dr. Elmasry diagnosed acute gastritis, benign hypertension, major depression, not otherwise specified, stable diabetes, oral candidiasis and GERD. (R. at 699.) Dr. Elmasry decreased Hill's dosage of Xanax and initiated delayed-release Cymbalta. (R. at 699.)

The same day, Hill saw Jeanne Watson, Ph.D., a licensed professional counselor, at Dr. Elmasry's referral. (R. at 695-97.) Hill stated that she began special education in the third grade and had poor grades. (R. at 695.) She stated that she was physically and sexually abused as a child. (R. at 696.) Hill stated that she dropped out of school in the ninth grade and began working full-time at age 17. (R. at 695-96.) She stated that she was working at McDonald's in 2005 when her mental problems resulted in her quitting. (R. at 696.) Hill reported problems with anxiety and depression, panic, obsessive compulsive disorder, ("OCD"), and post-traumatic stress disorder, ("PTSD"), among other things. (R. at 696.) Hill reported a history of depression and anxiety from early childhood, but she reported no prior psychiatric hospitalizations. (R. at 696.) Hill reported intermittent suicidal ideations with no plan.

(R. at 697.) Watson noted moderate impairment in short- and long-term memory and mentally retarded cognitive functioning. (R. at 697.) She diagnosed Hill with depression with mood swings, generalized anxiety with panic and OCD, PTSD and attention deficit disorder, ("ADD"). (R. at 697.) Watson noted the need to rule out personality disorder and learning problems, and she assessed Hill's then-current Global Assessment of Functioning score at 30,[6] with the highest in the previous year being 40.[7] (R. at 697.)

Watson performed a psychological evaluation at Dr. Elmasry's request on February 27, 2009. (R. at 690-93.) She administered the Bender Gestalt Motor Test and the Hooper Visual Organization Test, the results of which were consistent with attention deficit hyperactivity disorder, ("ADHD"), neurological impairment and emotional distress. (R. at 690.) The Hamilton Depression Scale/Hamilton Anxiety Scale also were administered, both of which yielded results in the "severe" range. (R. at 690.) The 16PF Personality Test revealed a high risk for domestic violence, substance abuse, somatic illness and compulsive behaviors. (R. at 691.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test also was administered, and Hill achieved a verbal IQ score of 67, a performance IQ score of 70

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas. . . ." DSM-IV at 32.

[7]A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ." DSM-IV at 32.

and a full-scale IQ score of 66, results that Watson deemed to be valid. (R. at 692.)

On March 30, 2009, Watson completed a mental assessment, indicating that Hill had no useful ability in all areas of occupational, performance and personal social adjustments. (R. at 716-17.) She concluded that Hill was unable to manage benefits in her own best interest. (R. at 717.) Watson based these findings on Hill's alleged auditory and visual hallucinations, mood swings, verbally aggressive behavior, panic attacks in social situations, mentally retarded functioning, poor judgment, poor concentration and attention, disorientation and inability to cope with changes in routine. (R. at 716-17.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 29, 2009, the ALJ denied Hill's claims. (R. at 21-38.) The ALJ determined that the medical evidence established that Hill suffered from the following impairments which, in combination, constituted a "severe" physical impairment: type II diabetes mellitus, abdominal and pelvic pain, obesity, reflux disease, hypertension, history of gallbladder surgery, history of bronchitis, status-post 2008 hysterectomy, history of recurring urinary tract infections and allergies. (R. at 26, 36.) The ALJ found that, beginning in January 2009, Hill had medically determinable mental impairments of affective disorder, anxiety related disorder, personality disorder, organic mental disorder and mental retardation, which were severe at times, but did not meet the 12-month durational requirement of the Act. (R. at 27, 31.) However, the ALJ found that, prior to 2009 the only mental health-related complaints and treatment received by Hill were for anxiety and depression and were not severe. (R. at 27, 30.) The ALJ concluded that Hill did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26, 36.) The ALJ found that Hill had the

residual functional capacity to perform a limited range of medium work. (R. at 37.) Therefore, the ALJ found that Hill was able to perform her past relevant work as a deli worker, a cook and a cashier. (R. at 35, 37.) Alternatively, based on Hill's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other light jobs existed in the national economy that Hill could perform, including jobs as a food prep worker, a dishwasher and a packer. (R. at 36.) Thus, the ALJ found that Hill was not under a disability as defined under the Act and was not eligible for benefits. (R. at 37.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g).

Hill argues that the ALJ erred by failing to find that she meets the criteria for the listing for mental retardation, found at 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.05C. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 10.) Hill also argues that the ALJ erred by finding that she could perform her past relevant work by failing to probe the significance of her nonexertional impairments. (Plaintiff's Brief at 7-10.) Finally, Hill argues that the ALJ failed to analyze the cumulative effect of all of her impairments on her ability to work. (Plaintiff's Brief at 10.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether

the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

Hill argues that the ALJ erred by failing to find that she meets the medical listing for mental retardation, found at § 12.05C. For the following reasons, I agree. To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C, a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See* 581 F. Supp. at 159. The

regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2010); *see Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

IQ testing performed by Watson, a licensed professional counselor, revealed a verbal IQ score of 67, a performance IQ score of 70 and a full-scale IQ score of 66, scores that Watson opined were valid. (R. at 692.) The Commissioner argues that these results should not be accorded any weight because Watson is not an "acceptable medical source" pursuant to 20 C.F.R. §§ 404.1513(a), 416.913(a). While it is true that Watson is not an "acceptable medical source" for purposes of establishing an impairment, her opinion may, nonetheless, be used to show the severity of an impairment and its effect on Hill's ability to work. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d) (2010). Given that there is no other IQ testing contained in the record, and given the fact that Hill consistently has stated that she was placed in special education beginning in the third grade and continuing until she dropped out of school in the ninth grade, I find that these IQ scores may not simply be ignored. I further note the ALJ's finding that Hill began to suffer from mental retardation in January 2009, a finding that clearly was based on Watson's IQ testing. However, it is well-settled that an individual's IQ is considered to remain relatively constant throughout her life, absent evidence of a change in a person's intelligence functioning. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989). Here, there is no evidence of a change in Hill's intelligence functioning. Moreover, this court has held that mental retardation is a lifelong, and not acquired, disability. *See Smith v.*

*Barnhart*, 2005 U.S. Dist. LEXIS 5975, at *10 (W.D. Va. Apr. 8, 2005). Thus, for all of these reasons, I find that substantial evidence does not support the ALJ's finding with regard to the first prong of § 12.05C.

Next, in order to meet the criteria of § 12.05C, Hill must show a physical or other mental impairment imposing additional and significant work-related limitation of function. I find that she has done so. Specifically, the ALJ found that Hill had the following impairments, which constituted a severe impairment: type II diabetes mellitus, abdominal and pelvic pain, obesity, reflux disease, hypertension, history of gallbladder surgery, history of bronchitis, status-post 2008 hysterectomy, history of recurring urinary tract infections and allergies. (R. at 26, 36.) The ALJ also found that, beginning in January 2009, Hill had medically determinable mental impairments of affective disorder, anxiety related disorder, personality disorder, organic mental disorder and mental retardation, which were severe at times, but did not meet the 12-month durational requirement of the Act. (R. at 27, 31.) The Fourth Circuit held in *Evans v. Heckler*, that "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). That being the case, I find that the ALJ's finding that Hill suffered from the above-listed severe impairments shows that she suffered from "a physical or other mental impairment imposing additional and significant work-related limitation of function," thereby meeting the second prong of § 12.05C.

As noted above, the introductory paragraph to § 12.05C makes it clear that mental retardation is a lifelong, and not acquired, disability. *See Smith*, 2005 U.S. Dist. LEXIS 5975, at *10. Thus, to qualify as disabled under this listing, a claimant also must demonstrate that she has had deficits in adaptive functioning that began during childhood. That being the case, I must determine whether substantial evidence supports a finding that Hill's impairment did not manifest itself during the developmental period, i.e., before age 22. I find that substantial evidence does not exist in this record to support this finding. Specifically, a plaintiff's current IQ score presumptively would be her IQ score before she was 22. *See Luckey*, 890 F.2d at 668. Additionally, there is evidence in the record that Hill was placed in special education classes beginning in the third grade and continuing until she eventually dropped out in the ninth grade.

For all of the above-stated reasons, I find that substantial evidence does not support the ALJ's finding that Hill does not meet the requirements of the medical listing for mental retardation, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C, and I recommend that the case be remanded to the Commissioner for further consideration of this issue and, if necessary, consultative evaluation by a psychologist. Given this recommendation, I find it unnecessary to discuss the remainder of Hill's arguments at this time.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

     1.    Substantial evidence does not exist to support the

Commissioner's finding that Hill does not meet the criteria of the listing for mental retardation, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C; and

2.    Substantial evidence does not exist to support the Commissioner's finding that Hill was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's motion for summary judgment, grant Hill's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further evaluation consistent with the Report and Recommendation.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    December 27, 2010.


/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE